**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| CDX HOLDINGS, INC. AND CARIS DIAGNOSTICS, INC. | § § § | |
| Plaintiff, | § § | |
| v. | § § | Civil Action No. 3:12-CV-126-N |
| DAVID HEDDON, | § § § | |
| Defendant. | § | |

## FINDINGS, CONCLUSIONS, AND RECOMMENDATION

Pursuant to the order dated January 17, 2012, this case has been referred for pretrial management. Before the Court is the *Motion for Preliminary Injunction, filed by CDX Holdings, Inc., Caris Diagnostics, Inc.*, filed January 13, 2012. Based on the relevant filings, evidence, and applicable law, the motion should be **DENIED**.

## I.  BACKGROUND

Caris Diagnostics, Inc. (Caris) and CDx Holdings, Inc. (CDx) (collectively Plaintiffs) move to preliminary enjoin a former employee, David Heddon (Defendant), from violating a non-compete agreement.

### A.  Factual Background[1]

Caris is a national specialty anatomic pathology provider based in Irving, Texas, that provides anatomical pathology services to specialty physicians practicing in outpatient settings. (Tr. at 130–31.)  CDx is also based in Irving, Texas, and is the holding company for Caris. (*Id.*)  Caris operates nationally and has approximately 5 to 6 competitors operating at the national level. (Tr.

---

[1]  The background is based on undisputed facts, and the testimony and evidence presented at the evidentiary hearing. The transcript of the evidentiary hearing will hereinafter be referred to as "Tr."

at 135.) D-PATH Dermatopathology (D-PATH), a division of Poplar Healthcare, is one of the few national competitors that operates on the same platform as Caris. (Tr. at 137.) Caris sells its products and services to customers through sales directors, whose primary role is to build relationships with Caris' clients and prospective clients to maintain business and gain new business. (Tr. at 145.) Sales directors report to regional vice presidents, who in turn report to the vice president of dermatopathology sales. (Tr. at 132–133.)

Defendant began his employment with Caris in February of 2008 as a director of business development selling pathology services to dermatologists and dermatology surgery centers. (Tr. at 32–33, 44, 78–79.) Shortly after his employment, Caris provided Defendant access to its SalesLogix database, which compiled detailed information about its customers that changed over time as new information was entered into the system. (Tr. at 81–82, 133, 150.) SalesLogix contained specific data about accounts, details collected during client visits, the volume of their business, information about each contact for a client, information about client preferences (such as how they liked their diagnostic reports to look, how they liked them delivered, and what, if any, interaction they liked for Caris to have with their patients), and a host of other information. (Tr. at 101, 125, 150–58.) While basic information about Caris' clients could be accessed through their website, the compilation of information contained in SalesLogix was password-protected and was not available from another source. (Tr. at 53, 109, 159–60.) If a competitor wanted to assemble this information, it would take substantial time and resources to complete. (Tr. at 126.) Defendant also had access to Caris' sales data through Caris' data warehouse. (Tr. at 160.)

On May 29, 2008, pursuant to a stock option award agreement, CDx granted Defendant an option to purchase stock subject to the conditions of the stock option award agreement and the 2007

2

Stock Incentive Plan. (Pls.' Ex. 4.) As a condition to the stock option award, the stock option award agreement provided that the plan administrator, "in its sole and absolute discretion may require [Defendant] to execute and become a party to a noncompetition agreement." (*Id.*, p. 7.) The following month, on June 23, 2008, Defendant entered into a Noncompetition, Nonsolicitation, and Nondisclosure Agreement (the Non-compete) with CDx. (Pls.' Ex. 3.) The Non-compete stated that as consideration, CDx was granting Defendant stock options simultaneously with the execution of the Non-Compete. (*Id.*, p. 1.)

The Non-compete included several restrictive covenants. (*Id.*, pp. 2–5.) It contained a non-disclosure covenant which provided that during and after his employment, Defendant would hold in the strictest confidence, and would not disclose, use or provide access to, or publish any confidential information except as such disclosure, use, or publication may be required in connection with employee's services for CDx. (*Id.*, p. 2.) With respect to the non-disclosure covenant, the Non-compete also provided that Defendant would have access to confidential information that he had not accessed prior to the date of the agreement, and that such information constituted trade secrets and/or confidential and proprietary business information of CDx "or its subsidiary, or its customers and suppliers, as the case may be." (*Id.*, pp. 1– 2.)

The Non-compete also contained a non-competition covenant, which provided that during his employment and for a period of one year after termination of his employment, Defendant would not for any reason: "directly or indirectly, either acting alone, or as a stockholder, partner, associate, creditor, consultant, adviser, franchiser, franchisee, director, officer, owner, employee or agent of any other person or entity, or in any other capacity, engage in or provide services to a company engaged in the Same Business . . . in the Territory . . ." (*Id.*, p. 4.) The term "Territory" was

3

defined as the United States and the term "Same Business" was defined as "the business of pathology diagnostics and therapeutic work flow solutions for physicians throughout the United States . . . together with any other business in which [CDx] engages during the term of [Defendant's] employment with [CDx]." (*Id.*, pp. 1, 4.)  The Non-compete provided that Defendant would receive substantial and valuable consideration for the covenant not to compete, including but not limited to confidential information, compensation and other benefits, and exposure to CDx's physicians, payors, customers, patients, and prospects.  (*Id.*, p. 4.)

The Non-compete further contained two non-solicitation covenants – a covenant not to solicit customers and a covenant not to recruit employees.  (*Id.*, pp. 4–5.)  The covenant not to solicit customers provided that Defendant would not solicit or attempt to solicit any CDx customers at any time during his employment and for a period of one year after the termination of his employment. (*Id.*, p. 4.)  The covenant defined CDx customers as "any person, company, or business that is or was a customer or prospective customer of [CDx], including but not limited to physicians, payors and other customers." (*Id.*)  The covenant regarding nonrecruitment of employees stated that Defendant would not solicit CDx employees during his employment and for a period of one year following the termination of his employment.  (*Id.*, pp. 4–5.)  A choice of law provision in the Non-compete stated that the agreement "shall be governed by, and construed in accordance with the internal laws (as opposed to conflict of law provisions) of the State of Texas." (*Id.*, p. 7.)

On November 15, 2011, Defendant emailed Karen Goldenson, an Arizona sales director, to inform her that he had been "hunting", and Goldenson inquired whether he had "an offer." (Pls.' Ex. 14.)  On November 22, 2011, CDx and Caris were purchased by Miraca Holdings, Inc. (Miraca). (Tr. at 39.)  On November 30, 2011, Defendant's stock options were cashed out in connection with

the purchase, and he received a check for over $20,000.  (Tr. at 42–43.)  Around the same time, he received a job offer from D-PATH.  (Tr. at 178, 181.)  He accepted the offer and agreed that the effective date of hire would be approximately January 1, 2012.  (Tr. at 178.)  On December 15, 2011, Goldenson forwarded him records regarding Caris' growth ideas in Michigan, and a spreadsheet with names of physicians practicing in Arizona that were potential future business for Caris.  (Tr. at 56, 60–62, 64; Pls.' Exs. 12, 13.)

In the second half of December of 2011, Defendant notified Caris' IT department that he was having problems with the laptop issued to him and requested them to repair the laptop.  (Tr. at 46; Pls.' Ex. 7.)  On December 28, 2008, an IT staff member informed him that the hard drive in his laptop was no longer functional and that he would not be able to finish the new laptop until January 3, 2012, when the SalesLogix administrator got back from vacation. (Pls.' Ex. 7.) The IT member explained that the SalesLogix administrator would have to make a new local SalesLogix database to put on Defendant's new laptop.  (*Id.*)  Defendant asked the IT staff member to ship the new laptop overnight if he could.  (*Id.*)

On January 2, 2012, Defendant e-mailed Goldenson that his regional vice-president and direct supervisor, Lisa Calabro, was going to have a bad day the next day.  (Tr. at 54–55; Pls.' Ex. 10.)  The following day, on January 3, 2012, Defendant sent Calabro two weeks' notice of his intent to resign from Caris.  (Pls.' Ex. 8.)  After sending his resignation notice, he sent an email to the Caris IT department confirming his home address as the shipping address for the new company laptop. (Pls.' Ex. 9.)  On January 10, 2012, citing this incident and others, Caris terminated his employment effective January 5, 2012.  (Pls.' Ex. 11.)  Caris also demanded the return of the new laptop and two client computers that were in Defendant's possession.  (*Id.*)  Defendant later returned the new laptop

5

to Caris.  (Tr. at 66.)  At the time his employment ended with Caris, Defendant was only selling dermatopathological services, even though he had also sold GI services previously.  (Tr. at 44.) While his sales territory consisted of the entire state of Florida and his job title was director of business development when initially hired, his sales territory was limited to the southwest portion of Florida and he occupied the position of Sales Director 3 at the time he left.  (Tr. at 44, 139, 146.)

After his employment ended, Caris discovered that Defendant created a list of Caris client names on January 9, 2012.  (Tr. at 68, 83–85; Plfs' Ex. 15.)  On the day she received his resignation, Calabro visited many of the clients serviced by Defendant and saw no evidence that D-PATH was providing them any business.  (Tr. at 162.)  However, upon a subsequent visit, she observed evidence that D-PATH was providing services to Derm Solutions – one of the highest volume customers serviced by Defendant.  (Tr. at 162–163.)

## B.  Procedural Background

On January 13, 2012, Plaintiffs filed a verified complaint against Defendant, claiming breach of contract, misappropriation of trade secrets and confidential and proprietary information, breach of duty of loyalty, tortious interference with existing and prospective business relations, and theft of personal property and trade secrets under the Texas Theft Liability Act.  (doc. 1.)  Plaintiffs sought a temporary restraining order, a preliminary injunction, and a permanent injunction enjoining Defendant from working or providing services to Caris' competitor, D-PATH, using or disclosing Caris' trade secrets and other confidential and proprietary information, soliciting Caris' customers, and soliciting its employees.  (*Id.*)  That same day, Plaintiffs filed a motion for a temporary restraining order (TRO) and a motion for a preliminary injunction.  (doc. 3.)

On January 18, 2012, the district court entered a TRO, and scheduled a hearing for January

19, 2012, regarding Caris' application for preliminary injunction. (doc. 11.) On January 19, 2012, the hearing was rescheduled for January 26, 2012. (doc. 13.) On January 25, 2012, the district court signed an agreed TRO vacating the earlier TRO. (doc. 18.) The agreed TRO enjoined Defendant and all other persons in active concert or participation with him, from certain activities. (*Id.*) The agreed TRO also rescheduled the application for preliminary injunction for February 8, 2010, and stated that it would remain in full force and effect until then. (*Id.*)

On February 8, 2010, this court conducted a hearing on the application for preliminary injunction. The parties agreed on the record in open court that (1) the agreed TRO would remain in effect until either March 2, 2010, or the date of the issuance of a recommendation on the motion for preliminary injunction, whichever occurs earlier, (2) the recommendation would be binding on the parties until entry of an order by the district judge adopting or declining the recommendation, and (3) the parties could file their post-trial briefs no later than February 15, 2012. With the post-hearing briefs now filed, the application for preliminary injunction is ripe for recommendation.

## II. PRELIMINARY INJUNCTION STANDARD

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Natural Res. Def. Council*, 129 S.Ct. 365, 376 (2008). To obtain a preliminary injunction, the movant must establish that: (1) he is likely to succeed on the merits; (2) he is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in his favor; and (4) an injunction is in the public interest. *Tex. Midstream Gas Servs., LLC. v. City of Grand Prairie*, 608 F.3d 200, 206 (5th Cir. 2010) (citing *Winter*, 129 S.Ct. at 374). The party seeking the preliminary injunction bears the burden of persuasion on all four requirements. *Bluefield Water Assoc., Inc. v. City of Starkville, Miss.*, 577

F.3d 250, 253 (5th Cir. 2009).  If the movant fails to carry the "heavy burden" to show each of the four prerequisites, a preliminary injunction is not warranted.  *See Enter. Int'l, Inc. v. Corporacion Estatal Petrolera Ecuatoriana*, 762 F.2d 464, 472 (5th Cir. 1985).

### III.  LIKELIHOOD OF SUCCESS ON THE MERITS

Plaintiffs seek a preliminary injunction based on their misappropriation of trade secrets claim and their contract claim for breach of the non-solicitation, non-competition, and non-disclosure covenants on grounds that there is a likelihood of success on the merits.  (doc. 3, p. 11.)  To establish the first element of likelihood of success on the merits, a "plaintiff must present a prima facie case but need not show that he is certain to win."  *Janvey v. Alguire*, 628 F.3d 164, 175 (5th Cir. 2010).  The first element is assessed by looking at standards provided by substantive law.  *Id.* (citing *Roho, Inc. v. Marquis*, 902 F.2d 356, 358 (5th Cir. 1990)).  As the Non-compete contains a provision stating that it will be governed by and construed in accordance with Texas law, and the parties apply Texas law to the issues, the Court likewise applies Texas substantive law.  (*See* doc. 1-1, p. 8.)

### A. Misappropriation of Trade Secrets

Under Texas law, a plaintiff claiming trade secret misappropriation bears the burden to show: "(1) existence of a trade secret, (2) breach of a confidential relationship or improper discovery of a trade secret, (3) use of the trade secret, and (4) damages."  *Moncrief Oil Int'l, Inc. v. OAO Gazprom*, 332 S.W.3d 1, 14 (Tex. App.—Fort Worth 2010, pet. filed).  A trade secret is any formula, pattern, device or compilation of information which is used in one's business and presents an opportunity to obtain an advantage over competitors who do not know or use it.  *Phillips v. Frey*, 20 F.3d 628, (5th Cir. 1994) (citations omitted); *In re Bass*, 113 S.W.3d 735, 739 (Tex. 2003).

Whether a trade secret exists is usually a question of fact to be decided by the judge or jury

8

as a fact-finder. *Gen. Universal, Sys., Inc. v. Lee*, 379 F.3d 131, 150 (5th Cir. 2004). To determine

the existence of a trade secret, a fact-finder must examine six relevant but non-exclusive criteria: (1)

the extent to which the information is known outside the business; (2) the extent to which it is

known by employees and others involved in the business; (3) the extent of measures taken to

safeguard the secrecy of the information; (4) the value of the information to him and to his

competitors; (5) the amount of effort or money expended in developing the information; and (6) the

ease or difficulty with which the information could be properly acquired or duplicated by others.

*Id.* (citing *In re Bass*, 113 S.W.3d at 740). "The status of information claimed as a trade secret must

be ascertained through a comparative evaluation of all the relevant factors, including the value,

secrecy, and definiteness of the information as well as the nature of the defendant's misconduct."

*Id.* (citing Restatement (Third) of Unfair Competition, § 39). Customer lists, pricing information,

client information, customer preferences, buyer contacts, and marketing strategies have all been

recognized as trade secrets. *Global Water Grp., Inc. v. Atchley*, 244 S.W.3d 924, 928 (Tex.

App.—Dallas 2008, pet. denied).

   To establish likelihood of success on the merits of their misappropriation claim, Plaintiffs

present evidence that a Caris colleague in Arizona sent Defendant records regarding Caris' growth

ideas in Michigan and names of potential Caris clients in Arizona, even though the information did

not relate to his sales territory in Florida. (Tr. at 56, 60–62, 64; Plfs' Ex. 12, 13.) Plaintiffs also

present evidence that after he sent his notice of resignation and before he was terminated, he

requested and received a computer that gave him access to a compilation of client information

through SalesLogix. (Tr. at 46; Pls.' Exs. 7–9.) Even if the growth ideas, the list of potential clients,

and the information compiled in SalesLogix qualify as trade secrets, Plaintiffs did not offer any

evidence, apart from some speculative testimony, showing that Defendant used or attempted to use any of that information.  (Tr. at 105.)

Plaintiffs also presented evidence that Defendant created a list of names of Caris' clients after he resigned from his position and before his termination.  (Tr. at 68, 83–85; Pls.' Ex. 15.)  His former supervisor at Caris testified that on the day that he resigned, she visited clients he had serviced while at Caris but saw no evidence that D-PATH was providing them any business.  (Tr. at162.)  In a subsequent visit, however, she observed evidence that D-PATH was providing services to Derm Solutions –  one of the highest volume customers serviced by Defendant at Caris.  (Tr. at 162–163.)  First, the list of clients does not qualify as confidential information because there is evidence showing that Caris' customer identities are public information accessible through its website. (Tr. at 110–114.)  Information that might otherwise be considered a trade secret loses that status if it is well known or readily available to the public.  *See Gaal v. BASF Wyandotte Corp.*, 533 S.W.2d 152, 155 (Tex. App.—Houston [14th Dist.] 1976, no writ) ("Where the former employer's customer lists are not trade secrets and are readily ascertainable from sources other than the employer's records, the former employee may legitimately compete with his former employer for those customers.").  Second, the former supervisor's testimony about D-PATH currently serving Derm Solutions is not evidence that Defendant directly or indirectly caused this one client to become D-PATH's customer.

Plaintiffs have failed to show a likelihood of success on the merits of their misappropriation of trade secrets claim.

## B.  Breach of Non-Competition and Non-Solicitation Covenants

The parties' dispute regarding the likelihood of success on the merits of the breach of the

non-competition and non-solicitation covenants focuses on enforceability.  The enforceability of a non-competition covenant is a question of law for the court to decide.  *Light v. Centel Cellular Co. of Tex.*, 883 S.W.2d 642, 644 (Tex. 1994), abrogated in part on unrelated grounds by *Alex Sheshunoff Mgmt. Servs., L.P. v. Johnson*, 209 S.W.3d 644 (Tex. 2006).  Section 15.50 of the Texas Business and Commerce Code, otherwise known as the Covenants not to Compete Act (the Act), governs the enforceability of non-competition covenants and non-solicitation covenants.  *See Guy Carpenter & Co. Inc. v. Provenzale*, 334 F.3d 459, 465 (5th Cir. 2003); *Corporate Relocation, Inc. v. Martin*, 2006 WL 4101944, at *9 (N.D. Tex. Sept. 12, 2006).  To be enforceable under the Act, a covenant must (1) be ancillary to an otherwise enforceable agreement at the time the agreement is made and (2) contain limitations as to time, geographical area, and scope of activity that are reasonable and do not impose a greater restraint than necessary to protect the promisee's goodwill or other business interest.  Tex. Bus. & Com. Code § 15.50(a).

1.  Ancillary to an Otherwise Enforceable Agreement

Determining whether a covenant is ancillary to an otherwise enforceable agreement at the time the agreement was made involves a two-step inquiry.  *See Marsh USA, Inc. v. Cook*, 354 S.W.3d 764, 771 (Tex. 2011).  A court must determine whether there is an "otherwise enforceable agreement" between the parties, and if so, it must determine whether the covenant is "ancillary to or part of" the agreement.  *Id.* (citing *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 849 (Tex. 2009).

*a. Otherwise Enforceable Agreement*

"The 'otherwise enforceable agreement' requirement is satisfied when the covenant is 'part of an agreement that contained mutual non-illusory promises.'"  *Marsh*, 354 S.W.3d at 773 (citing

11

*Sheshunoff*, 209 S.W.3d at 648–49).  Here, there was an otherwise enforceable agreement with mutual non-illusory promises.  Defendant entered into an agreement that he would not compete with CDx, solicit its clients, recruit its employees, or disclose its confidential information in exchange for the stock option price and a promise that he would receive confidential information.  Although the stock option agreement was executed almost a month earlier, it clearly gave CDx the sole and absolute discretion to require Defendant to execute a non-compete as part of the award.  The stock option award and the Non-compete were therefore not completely separate agreements executed at different times, as Defendant suggests, but were inter-related agreements.  An otherwise enforceable agreement existed because there was an offer, acceptance, and consideration for mutual non-illusory promises.  *See Marsh*, 354 S.W.3d at 773.

### b. Ancillary to or Part of

The next step is to determine whether the covenant is ancillary to, or part of, the otherwise enforceable agreement.  In *Light*, the Texas Supreme Court considered a two-pronged approach to determine whether the covenant is "ancillary to or part of" the otherwise enforceable agreement, requiring that "(1) the consideration given by the employer in the otherwise enforceable agreement must give rise to the employer's interest in restraining the employee from competing; and (2) the covenant must be designed to enforce the employee's consideration or return promise in the otherwise enforceable agreement."  883 S.W.2d at 647.  It recently revisited *Light* and clarified that there is no requirement that "consideration for the otherwise enforceable agreement give[] rise to the interest in restraining the employee from competing."  *Marsh*, 354 S.W.3d at 775.  Rather, "[c]onsideration for a noncompete that is reasonably related to an interest worthy of protection, such as trade secrets, confidential information or goodwill, satisfies the statutory nexus."  *Id.*

In *Marsh*, the court decided whether a covenant not to compete signed by a valued employee in consideration for stock options, designed to give the employee a greater stake in the company's performance, was unenforceable because the stock options did not give rise to an interest in restraining competition. *Id.* at 766. It held that the non-compete was not unenforceable on that basis because the consideration for the non-compete (i.e. the stock options) was reasonably related to the company's interest in protecting its goodwill – a business interest worthy of protection. *Id.* The court also emphasized that enforceability of a non-compete covenant "should not be decided on 'overly technical disputes' of defining whether the covenant is ancillary to an agreement." *Id.* at 777. Rather, the core inquiry is whether limitations contained in the covenants "are reasonable and do not impose a greater restraint than is necessary to protect the goodwill or other business interest of the promisee.'" *See id.* (quoting *Sheshunoff*, 209 S.W.3d at 655 & Tex. Bus. & Com. Code § 15.50(a)).

Here, there is evidence that sales directors, including Defendant, were valued employees of Caris[2] as they developed important business relationships with Caris' clients and were instrumental in generating goodwill for Caris. As in *Marsh*, it could be found that a plan to grant stock options to a valued employee was designed to give him a greater stake in Caris' performance by linking his pecuniary interests with its own interest in protecting its goodwill, i.e., the relationships developed with its customers. The stock options, which were consideration for the non-competition and non-solicitation covenants, were reasonably related to Caris' interest in protecting its goodwill. Finally, the non-competition and non-solicitation covenants were designed to enforce Defendant's

---

[2]   For purposes of the application for preliminary injunction only, the Court assumes that CDx and Caris are interchangeable entities under the Non-compete. There is evidence that CDx is the holding company for several entities including Caris and does not have its own operations. (Tr. at 86-87.)

consideration or return promise not to compete with Caris or solicit its customers and employees.

Defendant argues that unlike this case, there was evidence in *Marsh* that the employer's stock incentive plan generated business goodwill, that the employee was personally involved in generating goodwill, and that the employee actually exercised his stock options. (*See* doc. 23, pp. 15–16.) It can be argued here that the stock incentive plan with its non-competition clause was designed to generate goodwill and that Defendant himself generated goodwill because his job duties involved developing important business relationships with customers. At the preliminary injunction stage, Plaintiffs' burden is only to show likelihood of success on the merits, and not success on the merits. Moreover, while *Marsh* may be factually distinguishable because the employee in that case exercised his stock options, the *Marsh* court specifically held that the employer linked the interests of a key employee with the employer's long-term business interests by *awarding* (and not exercising) the employee stock options. 354 S.W.3d at 777 (emphasis added).[3]

In light of recent Texas Supreme Court jurisprudence, the non-competition and non-solicitation covenants are most likely ancillary to an otherwise enforceable agreement.

2. Reasonableness of Limitations

The more important inquiry regarding the enforceability of a non-competition or non-solicitation covenant is "whether the covenant 'contains limitations as to time, geographical area,

---

[3] The court need not determine whether the promise to provide Defendant confidential information that he had not accessed prior to the date of the agreement meets the "ancillary to" argument. Defendant argues that the promise fails the "ancillary to" requirement because Caris never delivered any confidential information as required by *Sheshunoff*, 209 S.W.3d at 651. (doc. 23, pp. 16–17.) The testimony at the hearing showed, however, that Defendant had access to confidential information throughout his employment, and the confidential information did not remain the same but changed over time. (Tr. at 45–46, 133-35, 146–49, 159–69.) Defendant also argues that any confidential information delivered was by Caris, a subsidiary of CDx, and not CDx itself. (*See* doc. 23, p. 17.) However, the promise to provide confidential information specified that such information "constituted trade secrets and/or confidential and proprietary business information of CDx "or its subsidiary, or its customers and suppliers, as the case may be." (Pls.' Ex. 3, pp. 1–2.)

and scope of activity to be restrained that are reasonable and do not impose a greater restraint than

is necessary to protect the goodwill or other business interest of the promisee.'" *Marsh*, 354 S.W.3d

at 777 (quoting *Sheshunoff*, 209 S.W.3d at 655 &  Tex. Bus. & Com. Code § 15.50(a)).  The non-

competition and non-solicitation covenants barred Defendant, during his employment and for a

period of one year after his employment, from performing all anatomic pathology work performed

by CDx anywhere in the United States, from soliciting or attempting to solicit any CDx customer,

and from recruiting any CDx employee.  (Pls.' Ex. 3, pp. 4–5.)

### a. *Time Limitation*

With respect to the time limitation, Texas courts have upheld covenants barring competition

for periods between one and two years, if the evidence shows a need for such a period.  *See Rimkus

Consulting Grp., Inc. v. Cammarata*, 255 F.R.D. 417, 436 (S.D. Tex. 2008) (citations omitted).

There  was testimony at the hearing that Caris' sales directors became privy to information, such as

client information, physician research, volume of customers, pipeline reports or sales prospects of

other sales directors for the next 30, 60, 90 days, information about any high risk accounts that were

in jeopardy of being lost, sales data, sales strategies, marketing programs, and client information

passed along on regular regional and national sales calls, during which information concerning sales

opportunities, new clients, and technology were discussed.  (Tr. at 45, 133, 146–48, 160.)  There was

testimony that this information was confidential and was not publicly available, that Caris had spent

time and resources to gather this information, and that the information had value to Caris and would

be valuable to its competitors.  (Tr. at 46, 133–34, 148–49, 159–60.)  However, there was also

testimony that the confidential information was continually changing and updated and had

potentially a short shelf life.  (Tr. at 134–35, 149.)  Moreover, while Plaintiffs claimed that their

15

sales strategies could be set for up to a year, they did not provide any evidence that such sale strategies existed or were actually shared with Defendant. (Tr. at 140.)  Plaintiffs have simply failed to meet their burden and show why a one year limitation is reasonable in this case.  *See Hunke v. Wilcox*, 815 S.W.2d 855 (Tex. App.— Corpus Christi 1991, no writ) (the plaintiff has the burden to prove the enforceability of a non-competition agreement).

### b. *Geographic Limitation*

As to geographic limitations, Texas courts have found that non-competition covenants that cover areas where the employee did not actually work are overbroad and unenforceable.  *See e.g. Butler v. Arrow Mirror & Glass, Inc.*, 51 S.W.3d 787, 793–94 (Tex. App.— Houston [1st Dist.] 2001, no pet.) ("A covenant not to compete with a broad geographical scope is unenforceable, particularly when no evidence establishes the employee actually worked in all areas covered by the covenant."); *Curtis v. Ziff Energy Grp.*, 12 S.W.3d 114, 119 (Tex. App.—Houston [14th Dist.] 1999, no pet.) ("Generally, a reasonable area for purposes of a covenant not to compete is considered to be the territory in which the employee worked while in the employment of his employer"); *Evan's World Travel, Inc. v. Adams*, 978 S.W.2d 225, 232–33 (Tex. App.—Texarkana 1998, no pet.) (finding that a covenant not to compete that restricted the employee from working in any State in which the employer had conducted its business during the employee's term of employment was "greater than necessary" to protect the employer's legitimate business interest).  Here, the covenant in its current form is unreasonable because it restricts Defendant from competing in all states, even though he was actually only serving the southwestern portion of Florida.

The cases that Plaintiffs rely on to show the reasonableness of the geographic limitation are distinguishable.  *See Williams v. Powell Elec. Mfg. Co.*, 508 S.W.2d 665, 668 (Tex. Civ.

App.—Houston [14th Dist. 1974, no writ) (covenant at issue was restricting former business owners who had sold a business with nationwide distribution); *Vais Arms, Inc. v. Vais*, 383 F.3d 287, 295–96 (5th Cir. 2004) (covenant was against prior business owner who had sold a business with a nation-wide presence in terms of sales and marketing); *Learn2.com, Inc. v. Bell*, 2000 U.S. Dist. Lexis 14283, at *30–21 (N.D. Tex. July 20, 2000) (employee being restricted was the company's vice president of research and development and production work, and his role extended his employment to all of the company's locations worldwide); *Courtroom Scis. Inc. v. Andrews*, 2009 WL 1313274, at *11 (N.D. Tex. May 11, 2009) (the court's concern about the national reach of the covenant was alleviated by the fact that under the terms of her new contract, employee would still have employment with her new company); *Curtis*, 12 S.W.3d at 118–19. Additionally, Plaintiffs have not shown that access to nationwide customer information justifies the national scope of the covenant and did not present any evidence showing that Defendant was actually provided with a nationwide sales or marketing strategy. They have failed to show that the time restriction is reasonable and does not impose a greater restraint than is necessary to protect the goodwill or other business interest of the promisee.

### c.  Limitation on Activity

Finally, the scope of activity limited by the non-competition and non-solicitation covenants is overbroad. "A restrictive covenant is unreasonable unless it bears some relation to the activities of the employee." *Wright v. Sport Supply Grp., Inc.*, 137 S.W.3d 289, 298 (Tex. App.—Beaumont 2004, no pet.) (citing *Peat Marwick Main & Co. v. Haass*, 818 S.W.2d 381, 386–87 (Tex.1991)). Here, the covenants at issue bar Defendant from performing all anatomic pathology work performed by CDx, even though his work with CDx almost exclusively involved dermatopathology with some

GI accounts. "A covenant not to compete that contains an industry-wide exclusion from subsequent employment is unenforceable." *See id.* (citing *John R. Ray & Sons, Inc. v. Stroman*, 923 S.W.2d 80, 85 (Tex. App.—Houston [14th Dist.] 1996, writ denied)); *see also Haass*, 818 S.W.2d at 386–88. The covenants at issue also prohibit Defendant from recruiting any CDx employee, and soliciting or attempting to solicit any CDx customer, even those with whom Defendant never had contact with while employed with Caris. "[A] covenant not to compete that extends to clients with whom a salesman had no dealings during his employment is unenforceable." *See Wright*, 137 S.W.3d at 298 (citing *Stroman*, 923 S.W.2d at 85). Plaintiffs have not shown why the limitations are reasonable and necessary to protect their goodwill and business interests. Their argument that Defendant had access to nation-wide customer information, without more, does not justify these limitations.

In conclusion, the non-competition and non-solicitation covenants are unenforceable in their current form because they contain unreasonable limitations with respect to time, geographical area, and scope of activity. Plaintiffs have failed to show a likelihood of success on the merits of their claim for breach of the non-competition and non-solicitation covenants.

### d.  Reformation of the Covenants

Plaintiffs request the court to reform the covenants, if necessary, to make them enforceable, and enjoin Defendant from contacting any Caris customers. (doc. 22, pp. 29–30.) Section 15.51(c) of the Act requires a court to reform a non-competition agreement if it is unreasonably broad in scope. *See TransPerfect Translations, Inc. v. Leslie*, 594 F.Supp.2d 742, 756 (S.D. Tex. 2009). Some Texas court have suggested that reformation may be appropriate at the temporary injunction stage. *See id.* and citations therein.

Even if the court were to reform the covenant so that Defendant is restricted from competing

only in the southwest portion of Florida, from soliciting Caris customers that he specifically dealt

with, or from recruiting employees that he worked with, Plaintiffs have not presented any evidence

that he is working in that specific portion of Florida for D-PATH, or that he contacted any of the

customers he dealt with as a Caris employee, or that he recruited any Caris employee.  His former

supervisor's testimony that she saw evidence of D-PATH serving Derm Solutions after he was

terminated, without more, does not show that he directly or indirectly solicited it to become a

customer of D-PATH.  Moreover, the email between Defendant and Goldenson about him "hunting"

and receiving an offer, does not show that he recruited her for D-PATH.  In other words, Plaintiffs

have failed to meet their burden to show that they will be successful on merits of their claim for

breach of the non-competition and non-solicitation covenants even if they are reformed.

## C.  Breach of Non-Disclosure Covenant

Plaintiffs have also failed to show a likelihood of success on their claim for breach of the

non-disclosure covenant.  The enforceability of a non-disclosure covenant is not governed by §

15.05, and it may be enforceable even if a non-competition covenant is not.  *See Corporate

Relocation, Inc. v. Martin*, 2006 WL 4101944, at *9 (N.D. Tex. Sept. 12, 2006).  Under Texas law,

non-disclosure covenants are more readily enforced than non-competition covenants because they

are not restraints on trade, do not prevent the employee from making use of the general experience

he acquired during his employment, and do not offend public policy.  *Olander v. Compass Bank*,

172 F.Supp. 2d 846, 852 (S.D. Tex. 2001) (citing *CRC-Evans Pipeline Int'l, Inc. v. Myers*, 927

S.W.2d 259, 265 (Tex. App.—Houston [1st Dist.] 1996, no writ.)).  They "prevent only the non-

disclosure of confidential information and trade secrets and confidential information acquired by the

former employee."  *CRC-Evans*, 927 S.W.2d at 265.  In order to determine whether they are

supported by consideration, courts are not confined to look only at the time the agreement is made and may consider any confidential and proprietary information, as well as trade secrets, that an employer may have given an employee before, during, and after the agreement is executed.  *See Corporate Relocation, Inc*, 2006 WL 4101944, at *14 (quoting *Olander*, 172 F.Supp.2d at 856; *CRC-Evans*, 927 S.W.2d at 265).

Here, the non-disclosure covenant prohibited Defendant from disclosing any confidential or proprietary information or trade secrets during and after his employment except as such disclosure, use, or publication may be required in connection with employee's services for CDx.  (Pls.' Ex. 3, p. 2.)  The covenant also stated that Defendant would have access to confidential information that he had not accessed prior to the date of the agreement.  (*Id.*, pp. 1–2.)  The testimony at the hearing showed that Defendant had access to information before and after the execution of the non-disclosure agreement that could be characterized as confidential information.  (Tr. at 45, 146-149, 160–61.)  There was also testimony that the purportedly confidential information changed over time. (Tr. at 134–35, 149.)  However, as discussed more fully above, Plaintiffs have not produced any evidence showing that Defendant used any confidential information thereby breaching the non-disclosure covenant.

Injunctive relief is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."  *Winter v. Natural Res. Def. Counsel*, 555 U.S. 7, 23 (2008) (citing *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997)).  Because Plaintiffs have not shown a likelihood of success on the merits of their breach of contract and misappropriation claims, they have simply not made a clear showing to justify the extraordinary relief they request.

## IV. RECOMMENDATION

Plaintiffs' application for preliminary injunction should be **DENIED**.

**SO RECOMMENDED** on this 2nd day of March, 2012.


IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE


## INSTRUCTIONS FOR SERVICE AND
## NOTICE OF RIGHT TO APPEAL/OBJECT

A copy of these findings, conclusions and recommendation shall be served on all parties in the manner provided by law. Any party who objects to any part of these findings, conclusions and recommendation must file specific written objections within 14 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's findings, conclusions and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Servs. Automobile Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).


IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE